**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JERMAINE BRISTER, | |
| Plaintiff, | Case No. 19-cv-4388 |
| v. | Judge John Robert Blakey |
| DENIS R. MCDONOUGH, Secretary of the United States Department of Veterans Affairs, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jermaine Brister sued his former employer, the Department of Veterans Affairs (the "VA" or "Defendant"), alleging disability discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 794. [5]. Defendant moves for summary judgment. [55]. For the reasons explained below, this Court grants Defendant's motion.

## I.    Factual Background[1]

The VA hired Plaintiff Jermaine Brister in 2011 as a food service worker. [64] ¶ 5. In October of 2016, the VA promoted him to a supervisor position within the nutrition and food service department. *Id.* ¶ 6. Bristol failed to successfully complete the VA's supervisory probationary period, however, and the VA thus demoted him back to a non-supervisory position—namely, a supply technician position in the VA's

---

[1] The Court draws the following facts from Defendant's Local Rule 56.1 statement of material facts, [58], Plaintiff's response to Defendant's statement of material facts, [64], Plaintiff's statement of additional facts, [65], and Defendant's response to Plaintiff's statement of additional facts, [73].

logistics department. *Id.* ¶¶ 7–8. Plaintiff assumed that position on October 2, 2017, reporting to a new supervisor, Euriel Wagner, and working regular shifts Monday through Friday, from 3:30 p.m. to midnight. *Id.* ¶¶ 8–10, 12.

During his first two weeks in the supply technician job, the weeks of October 2 and October 9, Plaintiff worked six of his nine scheduled days[2] and took three approved vacation days. *Id.* ¶ 14. But he then failed to show up for work on October 16, and he remained absent from work from October 16, 2017 through December 8, 2017. *Id.* ¶ 13.

Plaintiff claims that he woke up on Monday, October 16, 2017, immobilized from back pain and unable to get out of bed. [65] ¶ 7; [73] ¶ 7. Defendant does not dispute that Plaintiff's back was bothering him at this time, but it argues that his claim remains unsupported in the medical records. In fact, the records show Plaintiff did not seek any medical attention until October 24, 2017; they also show that, when he did seek treatment, he gave no indication that his back pain was immobilizing or even particularly debilitating.

In any event, Plaintiff texted Wagner on October 16, 2017, indicating that he would not be in to work that day and needed to take leave. [65] ¶ 8; [73] ¶ 8. Yet, the VA recorded Plaintiff as AWOL, absent without leave, meaning he did not show or call and had not previously been approved for leave. [64] ¶¶ 13, 15. During the pay period spanning October 15 to October 28, Plaintiff had just 4 hours and 30 minutes of sick leave available. *Id.* ¶ 16.

---

[2] The pay period included nine days, not ten, because of Columbus Day, a federal holiday.

According to Plaintiff's time records, Plaintiff remained AWOL during the pay periods spanning October 29 through November 11, 2017 and November 12 through November 25, 2017.[3]  *Id.* ¶¶ 17–18.  For the pay period beginning November 26, 2017 and ending December 9, 2017, Plaintiff remained absent from work, but the VA marked him "LWOP"—leave without pay—for one of his ten days and AWOL for the other nine days.  *Id.* ¶ 19.  Plaintiff's supervisor approved Plaintiff's request to take "leave without pay" status for his 8-hour shift on December 4, 2017.  *Id.* ¶ 20.

As it turns out, Plaintiff had actually communicated with his supervisor, Euriel Wagner.  He texted Wagner numerous times during his AWOL period, as follows:

> Plaintiff, October 16, 2017: Mr. Wagner this is jermaine brister i went to the hospital and i have a doctors excuse for today he wanted me to stay off ill bring it in tomorrow thanks.
>
> Wagner, October 16 at 2:15 PM:  Ok
>
> Plaintiff, October 17, 2017 at 1:15 PM:  Mr. Wagner im still not feeling well went back to the doctor wants me to stay out till thursday will bring in the proper paper work from doctor
>
> Wagner, October 17, 2017, at 3:08 PM: Ok. Please ensure that you bring in the paperwork  Is everything ok
>
> Plaintiff, October 24, 2017, at 2:20 PM: Mr. Wagner do you have a fax number so i can send you all of my doctor papers they want me to stay out 10 days
>
> Wagner, October 24, 2017 at 3:57 PM: 2246103557
>
> Wagner, October 25, 2017 at 12:56 PM: I never received the fax
>
> Wagner, October 27, 2017, at 9:13 AM: I still have not received the fax.

---

[3] Plaintiff contends he was unaware that he was scheduled to work on October 30, 2017 until he reviewed his timesheets on December 4, 2017.  [64] ¶¶ 12, 17, 18, 19.

Please give me a call ASAP. Thanks

[64] ¶ 21.  Plaintiff did not call Wagner in response to Wagner's October 27, 2017 text.

[58] ¶ 22; [64] ¶ 22.  Nor did Plaintiff enter any leave in the VA's online portal.

Instead, Plaintiff provided medical documentation concerning his absences, and, on October 30, 2017, texted Wagner, stating "Sorry about the late response but i did send the fax and gave jen [Kenneth Anderson, a co-worker] a copy to give to you just in case."  [64] ¶¶ 23, 24.

When Wagner did not respond, Plaintiff sent the following texts:

Plaintiff, November 3 at 6:40 AM: Morning i was just wondering was my leave not approved? Because i didn't receive a pay check just trying to figure it out thanks in advance

Plaintiff, November 6, 2017 at 3:10 PM:  Talked to my doctor today told him i was ready to come back to work so i have a appointment Wednesday and should be back thursday released

Plaintiff, November 13 at 5:18 PM:  The way they set my appointments this week looks like ill be back thursday thanks

Plaintiff, November 16 at 7:32 AM: Morning quick question is my leave not being approved because this is the second time i did t receive my pay can you please get back with to tell me something

Plaintiff, November 20 at 5:21 PM: I will be in tomorrow

Plaintiff, MON[4] at 5:23 PM: Wont be in today using my 4 hours of sl and 4of al if possible

[64] ¶ 23.  Plaintiff's November 3 text was the first time he mentioned leave to Wagner.

Although Plaintiff later provided medical documentation, the materials did not

---

[4] It is not clear whether the text dated "MON" came Monday November 20, Monday November 27, or Monday December 4.  *See* [58] at 77.

support Plaintiff's claim that he had been to the hospital on October 16, 2017 or that he had a doctor's note supporting his absences during the week of October 16. In fact, Plaintiff admits that he did not go to the hospital or any doctor on October 16 or 17, 2017, and he further admits that he did not seek medical attention until October 24, 2017, when he went to St. Joseph Hospital complaining of back pain. [64] ¶¶ 28–30.

Examination notes from his October 24 visit indicate as follows:

> 42-year-old male presents with complaints of low back pain that has been present for a few days. States that he often has low back pain due to the fact that he does a lot of heavy lifting at work. States that he does sometimes where (sic) a back support while at work but does not wear it all the time. He has been taking aspirin for the pain with some relief. States that it allows him to get some sleep at night. States that is (sic) not go to work today due to this pain. He denies any radiation of this pain to either leg. States that the pain is pretty much just in his low back and he feels that worse with certain movements. On exam he does have some tight, sore muscles felt paraspinally and likely this is just a strain.

[64] ¶ 30. The records from this visit make no mention of any order or suggestion for work restrictions. *Id.* ¶ 31.

On October 27, 2017, Wagner emailed Anitra McGee in Human Resources, to advise her about Plaintiff and to ask how to classify Plaintiff for purposes of his timecards. Wagner wrote:

> I have an employee that informed me that he would be out from 10/16–10/19 and would provide doctors note when he returned. On 10/20 and 10/23 he was a no call no show. On 10/24 he texted me stating that the doctor wants him to stay home for 10 days. I gave him the fax number so that he could fax in the Doctor's note. As of today, I have not received it. . . . Timecard certification needs to be done this week. Should I run him AWOL for the 2 days. Please advise.

[58] at 360. HR did not immediately respond to Wagner's request for advice.

At the same time Wagner was attempting to get guidance on what to write on Plaintiff's timecards, Plaintiff saw Dr. Robert Grindell at Mayfair Road Family Medicine for his back pain. *Id.* ¶ 32. Dr. Grindell documented Plaintiff's October 27, 2017 visit with notes stating as follows:

> no acute specific injury and his exam is reassuring. I do not think any advanced imaging is warranted. I given [sic] the option of watchful waiting since he has been improving significantly since the onset but he elects NSAID for starting physical therapy which I think is reasonable 2 weeks out of the injury. I referred him today. In regards to work he is inquiring about getting a letter for work. He reports that no light duty is available and he can only return when he is 100%. He does not feel safe to do so. At this point I gave him an open-ended letter indicating that he was seen today, will be evaluated by physical therapy, and plans to return to work when he feels 100%. I discussed if he needs any more formal recommendations we may have to consider a functional capacity evaluation and/or complete paperwork in person He expresses understanding.

[64] ¶ 32. Plaintiff left Dr. Grindell's office with a letter confirming the visit and indicating that Plaintiff did not "currently feel able to participate in his typical job duties safely. He will be referred to physical therapy and will return when he feels able to work unrestricted." [58] at 313. Notably absent from this letter is any opinion from Grindell concerning Plaintiff's ability to work or any medical need for any restrictions or limitations. *Id.*

The record actually includes two versions of Dr. Grindell's letter, identical in all respects except the date and the letterhead. The first, described above, is dated October 27 and documents a visit on October 27. [58] at 313. The second, dated October 17, 2017, purports to document a visit on October 17. *Id.* at 315. The record does not reveal exactly how the backdated letter came into existence, *Id.* ¶ 24, and

6

Dr. Grindell confirmed at his deposition that he first saw Plaintiff on October 27, 2017. *Id.* at 443.

On November 2, 2017, Anitra McGee in the VA's Human Resources Department, responded to Wagner's email about the timecard designations, asking whether Plaintiff had returned to work; Wagner responded that Plaintiff had not returned. [58] ¶ 44; *id.* at 366. McGee emailed Wagner again on November 13, 2017, and Wagner again reported that Plaintiff had not returned to work. [58] ¶ 45; *id.* at 369. Wagner reported that Plaintiff had said he would return to work Thursday (November 9) but then failed to show. [58] ¶ 45; *id.* at 369. Based upon the representations that Plaintiff had failed to contact Wagner and failed to return to work as scheduled, McGee recommended the VA "start a removal." *Id.* at 372. To this end, McGee sent Plaintiff a "return to duty" letter, [58] ¶ 46; Plaintiff disputes that he ever received such a letter. [64] ¶ 46. Wagner emailed McGee on November 14 indicating that Plaintiff texted him on November 6 stating that he would return to work on November 9, but once again he did not show up; Plaintiff then texted Wagner on November 13 to say he would be back on November 16, but Wagner did not believe he would show up that day either. [58] at 375.

On November 21, 2017, Plaintiff came to the VA and met with Wagner. At that time, Wagner claims Plaintiff asked Wagner, for the first time, to use leave to cover his absences. [65] ¶ 12; [73] ¶ 12. Afterward, Wagner emailed McGee to advise that Plaintiff had come to see him that morning to say that he planned to return to work that afternoon, but then Plaintiff failed to show up for his 3:30 p.m. shift. [58]

7

¶ 47.  Wagner also advised McGee that Plaintiff requested, for the first time, annual leave for the time he had been off; Wagner told McGee he did not want to authorize the leave because Plaintiff never asked for it until that morning and did not have a doctor's note or any medical documentation supporting his claimed work restrictions. [58] at 379.

On November 22, 2017, Plaintiff returned to Dr. Grindell and left the office with a letter indicating that he could return to work on November 27, 2017.  [58] at 317.  On November 22 or 23, 2017, Plaintiff hand-delivered a copy of Dr. Grindell's November 22, 2017 letter to Wagner.  [58] ¶ 25.  Yet Plaintiff did not return to work on November 27.

That day, McGee again emailed Wagner to ask about Plaintiff's status, and Wagner responded on November 28 that Plaintiff still had not returned to work.  *Id.* ¶ 48.  Wagner also advised that Plaintiff had come in on November 22 to provide medical documentation excusing him from work November 22–24, 2017, with a return-to-work date of November 27, 2017; yet Plaintiff failed to return to work on November 27.  *Id.*  Wagner marked Plaintiff LWOP for November 22–24, 2017, [65] ¶ 14; [73] ¶ 14, though it appears the LWOP later got changed back to AWOL.

The parties agree that, as of October 14, 2017, Plaintiff had accumulated approximately 225 hours of annual leave and 324 hours of leave without pay,  [65] ¶ 22; [73] ¶ 22, though he had just 4 hours and 30 minutes of sick leave available.  [64] ¶ 16.  And, although his initial texts to Wagner do not specifically mention leave, the VA does not dispute that Plaintiff later asked to use leave to cover his time off, *see*

[73] ¶ 23. It claims, however, that he failed to provide medical documentation to justify the use of sick leave or LWOP. *Id.* According to VA policy, the decision to grant leave is discretionary and made by the supervisor. [65] ¶ 24; [73] ¶ 24. Supervisors may also authorize the use of LWOP or other available leave instead of sick leave. *Id.* ¶ 25. The policy, however, allowed Wagner to approve just 8 hours of LWOP. *Id.*

On December 4, 2017, after Plaintiff stopped receiving a paycheck, Plaintiff met with a union representative about his job. Plaintiff testified that Wagner did not respond to his texts and then Plaintiff stopped receiving a paycheck, so he went to the union and his union representative advised him that he was going to get fired because of his AWOL status and would be better off resigning so that he could reapply to the VA right away. [65-1] at 58. Based upon this advice, Plaintiff resigned from the VA on December 8, 2017. [58] ¶ 52. In his resignation letter, Plaintiff thanked the VA for the opportunities it had given him and wished "the Veterans the best" and he offered to "assist with the transition." [58] at 322.

Approximately a year and half later, on June 28, 2019, Plaintiff sued, alleging that Wagner and the VA discriminated against him based upon his disability. *See* [1], [5] ¶¶ 21–26. The VA moves for summary judgment.

## II. Legal Standard

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law."

9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248. To show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

At summary judgment, courts must evaluate evidence in the light most favorable to the non-moving party and refrain from making credibility determinations or weighing evidence. *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255). The moving party bears the burden of establishing the lack of genuine disputes as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III. Discussion & Analysis

Plaintiff claims that the VA violated the Rehabilitation Act when it charged him with AWOL and then sought to terminate his employment based upon unfounded AWOL charges; he also claims that the VA discriminated against him and harassed him based upon his disability and failed to accommodate his disability.

Because Plaintiff brings his disability claim against a federal agency, rather than a private employer, his claims fall under the Rehabilitation Act and not the Americans with Disability Act (ADA). 29 U.S.C. § 794(b)(1). Courts look, however, to the standards applied under the ADA when determining whether a Rehabilitation Act violation has occurred in the employment context. *Steffen v. Donahoe*, 680 F.3d

10

738, 749 n.1 (7th Cir. 2012) (citing *Peters v. City of Mauston*, 311 F.3d 835, 842 (7th Cir. 2002)); 29 U.S.C. § 794(d). Thus, this Court refers to the Rehabilitation Act and the ADA interchangeably. An ADA violation occurs when a covered entity discriminates against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." *Steffen*, 680 F.3d at 738 (citing 42 U.S.C. § 12112(a)).

### A.     Plaintiff's Status as a Qualified Individual with a Disability

To prevail on his Rehabilitation Act claims, whether for discrimination, harassment, or failure to accommodate, Plaintiff must first demonstrate that he is a "qualified individual with a disability." *See, e.g., Am. Council of Blind of Metro. Chicago v. City of Chicago*, No. 19 C 6322, 2023 WL 2744596, at *4 (N.D. Ill. Mar. 31, 2023). *See also Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013) (observing that, to prevail on a failure to accommodate claim under the Rehabilitation Act, the plaintiff must establish that: (1) he is a qualified individual with a disability, and that (2) the defendant knew of his disability and (3) failed to reasonably accommodate it.). Thus, the Court must first consider whether the record shows that Plaintiff is, in fact, a qualified individual with a disability.

Of course, to be a qualified individual with a disability, Plaintiff must first show that he has or had a disability. *Steffen*, 680 F.3d at 743. The ADA defines "disability" as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment;

or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2); *see also Steffen,* 680 F.3d at 743. Merely having an impairment does not suffice under the ADA; an individual must show that the impairment substantially limits a major life activity. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002).

The Equal Employment Opportunity Commission (EEOC) instructs that an impairment "is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1) (2019).[5] A major life activity is one "of central importance to daily life," such as walking, seeing, and hearing. *Pashnick v. United Parcel Serv.*, No. 09 C 565, 2010 WL 4628523, at *2 (N.D. Ill. Nov. 8, 2010) (citing *Toyota*, 534 U.S. at 197); *see also* 29 C.F.R. § 1630.2(j)(1)(i) (2019) (providing a non-exhaustive list of major life activities, including caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, reaching, lifting, bending, speaking, breathing, and working).

At his worn deposition, Plaintiff testified that he experiences problems with his back two or three times a year, and, when the problems hit, he experiences unbearable pain and remains incapacitated for up to three days. [65-1] at 46. He testified that, when his back issues flare up, he needs help to do simple things like eating, walking, and going to the bathroom. *Id.* Plaintiff, however, never received

---

[5] EEOC regulations are "not binding on this Court," but they remain relevant to this Court's own independent analysis because "such administrative interpretations 'do constitute a body of experience and informed judgment to which courts and litigants may properly resort to guidance.'" *O'Neal v. City of New Albany*, 293 F.3d 998, 1009 (7th Cir. 2002) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

any diagnosis for his back issues. *Id.* at 47. When asked if he was ever diagnosed with any specific back injury or back condition, Plaintiff said, "not that I'm aware of. I don't know." [58] at 342.

With regard to the specific timeframe at issue here, Plaintiff testified that he woke up on October 16, 2017 in excruciating pain and could not move. [65-1] at 48. He testified that he has no idea what caused his pain, but he called his sister, and she came over and took him to the ER. *Id.* at 49. The record does not support this claim, as Plaintiff provided no medical documentation from October 16 2017; the earliest records date instead from October 24, 2017.

Plaintiff testified that, after purportedly going to the ER, he then followed up with his regular doctor, Dr. Grindell, "right away." [65-1] at 48. Again, the record undermines his assertion and shows that Plaintiff did not see Dr. Grindell until October 27, 2017. When Plaintiff did consult his doctor, the examination indicated Plaintiff had a sprain or strain, which would resolve on its own within a few days, or within two weeks at most. Dr. Grindell testified that Plaintiff did not report recurrent backpain. On the contrary, he reported that he was "not one to have recurrent back pain." [58] at 444. Grindell also testified that Plaintiff's exam revealed "nothing objectively abnormal"; rather, he had "tenderness when I pressed the muscles on either side of the spine in his low back," suggesting "a mild strain or sprain of the back that, maybe, does not show any objective findings but subjectively can be uncomfortable for somebody." *Id.*

Based upon his examination, Dr. Grindell believed Plaintiff's reported injury

"will likely resolve on its own without any intervention." *Id.* Dr. Grindell testified that most back strains resolve "within six weeks" so that would be "the upper range" of what "he would have expected" for Plaintiff. *Id.* at 446. In fact, Dr. Grindell believed, based upon his examination, that Plaintiff's issues likely would resolve within two weeks.[6] *Id.* Dr. Grindell testified that, because Plaintiff was still reporting tenderness and discomfort two weeks post-injury, however, he offered Plaintiff the option of a physical therapy referral, and Plaintiff accepted his offer. *Id.* at 445. Dr. Grindell also testified that he wrote the PT referral but did not believe Plaintiff pursued such therapy. *Id.* When asked whether Dr. Grindell would be surprised to learn that Plaintiff "was out for over two months," he responded, "Yes." [58] at 446. In fact, Dr. Grindell testified that Plaintiff's subjective symptoms were fully resolved by November 22, 2017. [58] at 448–49. Dr. Grindell testified that Plaintiff returned to his office on November 22, 2017 to request a return to work note for November 27, 2017. At that time, Plaintiff indicated that his back pain was 100 percent resolved and that he was able to return to work at full duty. [58] at 449–50.

Plaintiff testified similarly, stating that he experienced problems with his back two or three times a year, and each episode would last "a few days, up to three days sometimes." [65-1] at 46.

On the current record, Plaintiff's showing of a disability within the meaning of the Rehabilitation Act remains razor thin. Nonetheless, the parties agree that

---

[6] When Plaintiff left Grindell's office on October 27, he scheduled a follow up for November 15 in case he was still not doing well. *See* [58] at 446. Grindell testified that Plaintiff did not show up to that appointment. *Id.*

Plaintiff began experiencing some "back issues" a few years prior to 2017. [65] ¶ 1; [73] ¶ 1. They also agree that, at times, his back issues precluded him from caring for himself, driving, and eating. [65] ¶ 3; [73] ¶ 3. And, indeed, Defendant concedes for purposes of this motion that Plaintiff was disabled. As a result, this Court assumes this to be the case.

Turning to the question of whether Plaintiff was "qualified" for his job, a person "constitutes 'a qualified individual under the Rehabilitation Act' where he 'is otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation.'" *Roberts v. McDonough*, No. 21 C 865, 2023 WL 3763532, at *4 (N.D. Ill. May 31, 2023). For purposes of both the ADA and the Rehabilitation Act, "regular attendance is an essential function of many jobs." *Whitaker v. Wisconsin Dep't of Health Servs.*, 849 F.3d 681, 684–85 (7th Cir. 2017) (citing *Basden v. Professional Transportation, Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) ("An employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance."); *Jovanovic v. In–Sink–Erator Division of Emerson Elec. Co.*, 201 F.3d 894, 899–900 (7th Cir. 2000) ("Common sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his job.")). Although some exceptions to this general rule may exist, Plaintiff has offered no evidence to suggest that his job falls within an exception. On the contrary, Plaintiff testified that supply technicians like him worked in the ward rooms, scanning, dating, rotating, and replenishing products for

use in those rooms, [65-1] at 41, 48, and Wagner testified that his department's staffing issues meant he did not have extra workers able to pinch hit for absent workers. [73] at 39. Regular attendance was thus essential to the continued smooth operation of the VA facilities. A worker "who cannot do the job even with a reasonable accommodation has no claim under the ADA"—even if the employee's inability to perform the job "is due entirely to a disability." *Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008).

Under the circumstances, the Court cannot say that, in the fall of 2017, Plaintiff demonstrated an ability to maintain regular attendance or to perform the essential functions of his job, with or without reasonable accommodation—indeed, the only accommodation he sought, even now, is a leave of absence. *See Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) ("An employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance"; a plaintiff "whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes."). Had the VA granted the accommodation Plaintiff requests, he still would not meet the essential function of regular attendance.

In the months leading up to his resignation, Plaintiff missed weeks of work; and, although he claims he missed some days because of uncertainty about his leave status, he never returned to work, even when his doctor indicated that he could do so. What's more, even though Plaintiff argues that he had never been disciplined and

never had any significant attendance issues prior to October 2017, [73] ¶¶ 4, 5, 6, his attendance records undermine the claims about his work record. Even before the events giving rise to this lawsuit, Plaintiff had a history of being marked AWOL, including on two days in the month before the current incident. *See* [65-1] at 1–2 (showing AWOL August 27–28, 2016; June 12, 2017; September 15 and 23, 2017). And Wagner, who did not become Plaintiff's supervisor until October 2, 2017, had nothing to do with those AWOL marks. In October of 2017 Plaintiff also failed to meet the VA's requirements to continue as a supervisor and was thus demoted; he does not challenge that decision or dispute that he failed to comply with the VA's supervisory requirements. Under these circumstances, Plaintiff cannot show that he was a "qualified individual" who could perform the essential functions of his job with or without reasonable accommodation.

### B. Plaintiff Has Offered No Evidence of Causation

Even if Plaintiff could show that he is a qualified individual within the meaning of the Rehabilitation Act, his discrimination claim still fails as a matter of law. To prove a claim of disability discrimination under the Rehabilitation Act, a plaintiff must show that: (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) he suffered an adverse job action "solely by reason of ... his disability." 29 U.S.C. § 794(a); *see also Felix v. Wis. Dep't of Transp.*, 828 F.3d 560, 568 (7th Cir. 2016). The "solely by reason of" causation standard is "stricter than the causation standard in Title I of the ADA, which the Rehabilitation Act otherwise incorporates for its liability

standards." *Swain v. Wormuth*, 41 F.4th 892, 899 (7th Cir. 2022) (citing 29 U.S.C. § 794(d); *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021)).

Plaintiff claims that "there is no reason other than Brister's disability and request for an accommodation (brief leave) for Wagner to treat Brister so negatively and violate VA policy." [63] at 19. Here, Plaintiff's claim is conclusory, and he has offered no evidence to show that Wagner classified him as AWOL or otherwise denied him leave "solely by reason of his disability." Indeed, it appears that Wagner may have been confused about whether, under the circumstances, he should certify Plaintiff's time as AWOL or LWOP, and he sought guidance on the point from HR, which advised that he lacked the authority to certify Plaintiff as LWOP for all of the days Plaintiff missed. And the only evidence on Wagner's state of mind in the record comes in his email to HR where he indicated that he did not want to approve Plaintiff's leave request because Plaintiff waited so long to ask for leave.

Plaintiff has offered no evidence to suggest that Wagner certified Plaintiff as AWOL or otherwise denied any leave request because of Plaintiff's disability. Rather, the record shows that Wagner and HR took the reasonable steps they did because Plaintiff failed to provide competent medical documentation to justify his absences until he had been absent for at least nine days; and, even then, the documentation did not include any medical basis for continued absences or limitations or restrictions. The record also shows that Plaintiff failed to return to work even after his doctor cleared him to do so and even after his back pain had fully resolved.

Plaintiff may, or may not, have lied to Wagner and forged a doctor's letter (this Court need not make a finding), but the record unquestionably shows that he failed to properly substantiate his leave with medical documentation. On the current record, the Court cannot say why Plaintiff behaved the way he did. But, given the applicable legal standards, the relevant question is whether *Wagner* behaved the way he did *because of Plaintiff's disability*. Wagner may have denied Plaintiff leave because he believed Plaintiff lied or believed Plaintiff failed to provide medical documentation to back up his claims. He may have denied Plaintiff leave because Plaintiff did not request leave through the proper channels, or failed to use the proper language regarding leave, or because he believed he was unable to approve Plaintiff's leave request under the VA's policies. But the record includes no evidence to suggest that Wagner denied Plaintiff leave *because of his disability*. Indeed, when asked what basis he had to believe that Wagner's AWOL characterization was based upon discrimination, Plaintiff testified, "I honestly don't know." [58] at 333. His conclusory claim concerning causation will not suffice at this stage. *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) ("Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (quoting *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003)).

Plaintiff's failure to accommodate claim fails for the same reason. When asked to clarify the basis for his failure to accommodate claim, Plaintiff testified that the VA failed to accommodate his disability because "they would not respond to me or

give me any kind of indication that they knew what was going on and they didn't receive all my information that I did. They just left me out in limbo." [58] at 334. He conceded that he never requested an accommodation. *Id.* at 335. Nor did he ever talk to the VA's disability coordinator or any other personnel. *Id.* Instead, he merely testified that he was never offered an accommodation and did not know what accommodations were available to him. *Id.* But, to the extent his request for leave amounts to a request for an accommodation, as above, he must still demonstrate that the VA or Wagner denied his request for leave *because of his disability*. And, as above, the record does not support the point.

In assessing Plaintiff's claim, the Court asks whether a reasonable jury could conclude that Defendant took adverse action against Plaintiff solely by reason of his disability. The answer is no. Though Defendant bears the burden of showing that summary judgment is appropriate, Plaintiff "may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits"; rather, he "must go beyond the pleadings" and support his contentions "with proper documentary evidence." *Beardsall*, 953 F.3d at 972 (citing *Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 563 (7th Cir. 2001); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). Plaintiff argues that Wagner ignored his requests for leave and subjected him to AWOL without telling him. He then argues that Wagner had no reason to hide the AWOL entries "other than to hide his discriminatory animus." [63] at 17. The claim here is similarly conclusory and remains unsupported in the evidence.

Even Plaintiff's own union representative testified that employees may access their own leave records through the leave system, Vatas. [65-2] at 24. She also testified that, if an employee was "out of annual leave and they have sick leave or vice versa, they have a choice of using one leave or the other in lieu of or they can simply -- they can also ask for leave without pay but leave without pay is under the discretion of the supervisor." [65-2] at 24. The timesheets remained accessible to employees through the leave system, and the record contains no evidence to support Plaintiff's conclusory claim that Wagner hid Plaintiff's AWOL marks and certainly no evidence suggesting that he did so out of discriminatory animus. On the contrary, the record shows that Plaintiff's attendance status was entered properly into the system and Wagner timely certified Plaintiff's timesheets confirming his status. Plaintiff's unsupported inference remains unreasonable, especially in the absence of any other evidence in the record tending to suggest discriminatory animus. *See REXA, Inc. v. Chester*, 42 F.4th 652, 662 (7th Cir. 2022), *reh'g denied*, No. 20-2953, 2022 WL 3724306 (7th Cir. Aug. 29, 2022) ("An inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage, nor is a 'conceivable' inference necessarily reasonable at summary judgment.").

Plaintiff claims Wagner "has given several false statements about Brister's disability and leave and has intentionally thwarted Brister's attempt to obtain leave. Wagner denied receiving Brister's requests for leave or texts requesting leave, which is false. Wagner denied receiving Brister's medical documentation, which is false." [63] at 18. And he asks the Court to infer discriminatory animus from these

purportedly false statements. But there is no question that Plaintiff did not provide medical documentation for his absence until at least October 30, 2017, after missing ten days of work. Wagner's statements were thus true at least at relevant points in time. And any inference of discrimination based upon these allegedly false statements thus remains unreasonable. *REXA*, 42 F.4th at 662 ("An inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage"). Moreover, even if the statements were false, the leap required to find that the statements were false because of discriminatory animus remains wholly unsupported.

Nor can Plaintiff prove harassment because of any disability. At his deposition, Plaintiff testified that he felt harassed because the VA "wasn't reaching out to me back and I was trying to give it to them and just – they was steadily giving me the AWOL's." [58] at 337. He testified that "the AWOL's and everything were the harassment because you're giving me disciplinary actions without communicating with me and letting me know what's going on and I'm trying to communicate with you guys." *Id.* at 336. But, as above, he has offered no evidence to show that the AWOLs stemmed from disability discrimination. When asked at his deposition if he knew of any employees who called in sick based upon an emergency medical condition, like he did, and did not get charged AWOL, he stated, "no, I wouldn't – you know, I wouldn't be privy to that information because of HIPAA." [58] at 344. Nor did he have any evidence to suggest that other employees were allowed to use leave when they called in sick for an emergency condition, as he did. *Id.* at 345. In the

absence of any evidence suggesting discriminatory animus or otherwise demonstrating that Wagner and the VA denied him leave or marked him as AWOL solely because of disability discrimination, Plaintiff may not proceed.

## IV.    Conclusion

For the reasons explained above, this Court grants Defendant's motion for summary judgment [55] and directs the Clerk to enter judgment for Defendant and against Plaintiff on Plaintiff's Rehabilitation Act claims.  All dates and deadlines are stricken.  Civil case terminated.

Dated: March 28, 2024

Entered:

John Robert Blakey
United States District Judge